## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOROUGH OF MCKEES ROCKS, | ) | |
| | ) | |
| | ) | 2:21-cv-530-NR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEGHENY COUNTY SANITARY | ) | |
| AUTHORITY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

The Borough of McKees Rocks, seeking to enjoin an anticipated construction project, sues Allegheny County Sanitary Authority ("ALCOSAN"). According to the Borough, ALCOSAN intends to construct a sewage-conveyance tunnel on a specific plot of land within the Borough's borders. The Borough asserts that this anticipated construction, which will be near heavily-trafficked residential and commercial areas, will cause various public nuisances. In addition, the Borough contends that ALCOSAN was required, by a consent decree to which ALCOSAN (but not the Borough) is a party, to confer with the Borough before finalizing its plan involving this construction. ALCOSAN did not do so. The Borough thus brings four counts of public nuisance, and one count for violating the consent decree.

ALCOSAN now moves to dismiss the complaint. It first argues that the public nuisance claims are not ripe because the construction is only hypothetical and contingent at this point. ALCOSAN, moreover, argues that the public nuisance claims fail to state plausible claims under Rule 12(b)(6). Finally, ALCOSAN asserts

that the Borough lacks standing to enforce the consent decree. The Borough opposes ALCOSAN's motion.

After careful consideration, and for the reasons discussed below, the Court denies ALCOSAN's motion to dismiss. The Court finds that the Borough's public nuisance claims are ripe, and state plausible claims for relief. The Court further concludes that the Borough is a third-party intended beneficiary of the consent decree's relevant provisions, so the Borough has standing to enforce the decree.

## BACKGROUND

Taking as true the facts alleged in the complaint, the relevant facts are as follows. ALCOSAN operates a sewage conveyance and treatment system that serves the Borough (as well as other municipalities). ECF 1-2, ¶¶ 82-83. In 2007, the EPA sued ALCOSAN for violating the Clean Water Act based on ALCOSAN allegedly discharging pollutants into regulated waters. *Id.* at ¶¶ 91-93, 98. The lawsuit resulted in ALCOSAN entering a consent decree with the EPA the following year. *Id.* at ¶ 99. This 2008 consent decree required ALCOSAN to coordinate with its customer municipalities and seek their comments and input in drafting a "Wet Weather Plan," which ALCOSAN did in 2012. *Id.* at ¶¶ 101-02, 104-10. The draft Wet Weather Plan, and the finalized Plan, referred to a new sewage tunnel being constructed in the future, but provided no further details about it. *Id.* at ¶¶ 110-14.

In January 2019, ALCOSAN submitted a modified Wet Weather Plan to the EPA, referred to as the "Clean Water Plan." *Id.* at ¶ 120. And in May 2020, ALCOSAN and the EPA agreed to a Modified Consent Decree, which this Court approved (the "Modified Consent Decree" or "Decree"). *Id.* at ¶¶ 121, 123; *see also United States v. Allegheny Cnty. Sanitary Auth.*, No. 2:07-cv-737, ECF No. 39 (W.D. Pa.). Under the Modified Consent Decree, like the original consent decree, ALCOSAN agreed to solicit and consider comments from its customer municipalities (like the Borough), and coordinate with the municipalities, in developing the Clean Water

Plan.  ECF 1-2, ¶ 133.  But in developing its latest plans and changes, including in the Clean Water Plan, ALCOSAN failed to comply with these requirements.  *Id.* at ¶ 135.  This failure, according to the Borough, led to the present dispute, namely the Borough's objections to ALCOSAN's plans to construct a sewage-conveyance tunnel in a particular location.

While the Modified Consent Decree specified that ALCOSAN would construct a tunnel under the Ohio River to convey sewage, it did not specify the location of the tunnel.  *Id.* at ¶¶ 124-28, 136.  The Decree did specify, however, that construction of the tunnel would begin by March 1, 2023, and be completed and in operation by December 31, 2027.  *Id.* at ¶ 128.  In addition, the Modified Consent Decree referred to additional construction projects regarding the "consolidation" or "improvement" of existing sewer systems.  *Id.* at ¶¶ 129-30.

The Borough eventually learned that ALCOSAN chose a location for the tunnel's construction within the Borough's borders.  That is, ALCOSAN purchased property (from a third party) within the Borough's borders to use as the launch site for the construction of the new tunnel, as well as the launch point for the additional construction projects contemplated by the Modified Consent Decree ("the property"). *Id.* at ¶¶ 137-41, 147.  And on top of purchasing the property, ALCOSAN has prepared design drawings and conducted site surveys of the property, in preparation for the construction.  *Id.* at ¶ 152.  The Borough is concerned with the effect this construction will have on the surrounding residents and communities, especially because it will involve demolishing the building currently on the property, excavating a large pit, boring a tunnel, and accumulating excavated spoils and other construction materials. *Id.* at ¶¶ 140-41.

As a result, the Borough filed this lawsuit against ALCOSAN.  In Counts I – IV, the Borough brings separate public nuisance claims, based on the construction project's effects and impact, especially considering the specific location of the

- 3 -

property. In particular, adjacent to the property is a low-income residential housing unit, where the residents rely on public transportation and walking to travel. *Id.* at ¶¶ 17-22, 138. The area around the property also already suffers from heavy traffic and congestion, and is near the Borough's primary commercial district. *Id.* at ¶¶ 8-15, 25-36, 186.

At bottom, each of the public nuisance claims, while focusing on different victims and impacts of the construction, are based on the construction causing excessive noise, vibrations, dust and dirt, an open excavation pit, the accumulation of excavated materials, noxious fumes, and exacerbated traffic congestion. *E.g.*, *id.* at ¶¶ 155-63, 171-73, 175-76, 185-88, 205-17. According to the Borough, these public nuisances will negatively impact the surrounding residential communities (Count I), the safety and welfare of the surrounding community (Count II), and the surrounding businesses (Count III). As for Count IV, the Borough alleges that ALCOSAN's construction would violate the Borough's zoning ordinances, based on the same nuisances underlying Counts I – III.

Finally, in Count V, the Borough contends that ALCOSAN violated the Modified Consent Decree by failing to solicit and consider comments from the Borough, and confer with the Borough, before finalizing the Clean Water Plan and its anticipated construction project. The Borough seeks injunctive relief as to each of the five claims.

ALCOSAN moves to dismiss all five claims. ECF 4; ECF 5. Specifically, ALCOSAN argues that the public nuisance claims are neither ripe nor state plausible claims. ALCOSAN further argues that the Borough lacks standing to enforce the Modified Consent Decree. The Borough filed an opposition brief (ECF 7), and ALCOSAN filed a reply brief (ECF 8). The matter is now ready for disposition.

**LEGAL STANDARD**

In arguing that the Borough's claims are not ripe and lack standing, ALCOSAN presents a facial attack (rather than a factual attack) to the Borough's claims.[1] Therefore, while a motion to dismiss on standing grounds is "properly brought pursuant to Rule 12(b)(1)," the Court applies the Rule 12(b)(6) standard in analyzing ALCOSAN's ripeness and standing arguments. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) ("In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. … Thus, a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)[.]" (cleaned up)).

As to ALCOSAN's 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The "District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Any reasonable inferences should be considered in the light most favorable to the plaintiff. *Lula v. Network Appliance*, 255 F. App'x 610, 611 (3d Cir. 2007) (citing *Rocks v. City of Philadelphia.*, 868 F.2d 644, 645 (3d Cir. 1989)).  And the defendant bears the ultimate burden of showing that its motion to dismiss should be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

---

[1] ALCOSAN's motion is a facial attack because it is brought before ALCOSAN "has filed an answer or otherwise contested the factual allegations of the complaint." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).  That is, it "contests the sufficiency of the pleadings" on "its face." *Id.*

## DISCUSSION & ANALYSIS

ALCOSAN moves to dismiss all five of the Borough's claims. For the reasons below, the Court denies ALCOSAN's motion to dismiss in its entirety.

**I.   The Borough's public nuisance claims are ripe and state plausible claims, so the Court denies ALCOSAN's motion to dismiss Counts I – IV.**

ALCOSAN contends that the Borough's public nuisance claims (Counts I – IV) are not ripe under Rule 12(b)(1), and also fail to state plausible claims under Rule 12(b)(6). The Court finds both contentions unavailing.

### A.   The Borough's public nuisance claims (Counts I – IV) are ripe.

ALCOSAN first argues that the Borough's public nuisance claims are not ripe. The Court disagrees.

The ripeness doctrine "seeks to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 372 (W.D. Pa. 2020) (Ranjan, J.) (cleaned up). "A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citation omitted). That said, a party "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *PG&E Co. v. State Energy Res. Conservation & Dev. Com'n*, 461 U.S. 190, 201 (1983) (cleaned up). And while the ripeness doctrine seeks to ensure "that cases present courts an adequate record to permit effective review and decisionmaking," *Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1247 (3d Cir. 1996), a facial attack brought before the record is developed requires the Court to

assume as true the facts alleged in the complaint, *Constitution Party of Pa.*, 757 F.3d at 358.

Ultimately, "[r]ipeness involves weighing two factors: (1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." *Artway*, 81 F.3d at 1247 (citation omitted).

Applying these principles, the Court concludes that the Borough's claims are ripe.

i. **The parties would suffer hardship if the Court withheld consideration.**

Applying the first factor—the hardship to the parties of withholding court consideration—the Court finds that it weighs in favor of ripeness. This is so for several reasons.

It is certainly plausible that the Borough's alleged harms from the construction will ensue, and thus hardship would result if the Court withheld consideration. To begin with, the alleged construction is far from speculative—rather, it's impending. ALCOSAN is required, by the Modified Consent Decree, to begin the construction project within a year, and it has taken steps to begin the construction on the property. *E.g.*, ECF 1-2, ¶¶ 125-28, 147, 152. Specifically, ALCOSAN is required—by Court order—to begin the construction by March 1, 2023. *See id.* at ¶ 128 ("Appendix Z indicates that work on the Ohio River Tunnel is scheduled to begin on March 1, 2023[.]"); Decree, ¶ 172 (incorporating the appendices "into, and . . . part of, this Consent Decree"). There is thus no question that the construction project will occur.

Further, as the Court must accept as true the complaint's plausible allegations, ALCOSAN's construction project and its resultant harms "will" occur and are "inevitable."[2] *See, e.g.*, ECF 1-2, ¶¶ 155-58, 175-76, 185-88. Certainly, it's at least

---

[2] As discussed below, while the public nuisance claims are grouped under separate counts, the harms and public nuisances alleged in Counts I – IV are ultimately based on the same alleged harms and dangers (*e.g.*, open excavations with accumulating

plausible that the Borough's alleged harms and effects caused by the construction will result—indeed, it's no secret that construction can cause the alleged harms, and it's particularly plausible when considering the central location of the property. Applying the relevant standard of review, then, if the Court withheld consideration of the issues, the anticipated harms will "inevitably" result, as plausibly alleged in the complaint. *See Constitution Party of Pa.*, 757 F.3d at 358.

Moreover, to withhold court consideration now would cause additional hardship to both parties by leaving significant, costly, and unaddressed questions to loom over the construction project. For example, if the Court dismissed the case as not ripe, it would require the Borough to wait to sue until ALCOSAN was on the eve of beginning, or had already begun, construction—meaning the Borough would be forced to wait until the alleged harms materialized. *See, e.g.*, *Boockvar*, 493 F. Supp. 3d at 373 ("[I]f the Court were to find that Plaintiffs' claims were not ripe, Plaintiffs would be burdened. This is because Plaintiffs would then have to either wait until after the election occurred—and thus after the alleged harms occurred—or Plaintiffs would have to bring suit on the very eve of the election, and thus there would be insufficient time for the Court to address the issues."). Similarly, withholding court consideration would burden ALCOSAN, as it would have to plan (and possibly begin) its construction project—and incur costs—with no clarity as to the Borough's claims. *See, e.g.*, *PG&E Co.*, 461 U.S. at 201 (describing harms that could result from a company having to begin construction without clarity on underlying legal questions that could affect the permissibility of the project). Thus, both parties may suffer

---

excavated spoils, excessive noise and dust, dangerous traffic congestion). Because the Court must accept the allegations as true, the inevitability of the alleged harms applies to all four counts.

significant hardship if the Court withholds consideration of the Borough's claims. Judicial review is therefore appropriate.

The crux of ALCOSAN's arguments to the contrary is that the Borough's claims and alleged harms are based on contingencies that may not happen as alleged and are therefore not ripe. But there are two key shortcomings to this argument.

First, ALCOSAN's argument ignores that the Court must apply the Rule 12(b)(6) standard, so the complaint's allegations are taken as true and any inferences are drawn in the Borough's favor. Beyond that, this isn't a situation in which the complaint baldly alleges an undefined construction project. ALCOSAN may be right that complaining about the general effects of an amorphous construction project, with nothing more, may present an unripe claim. Importantly here, however, the complaint pleads a series of specific and concrete facts that nudge the nuisance claims from speculative to concrete.

For example, the complaint pleads specific design preparations and features, specific Borough properties impacted by the design plans, and a detailed description of how the project, as designed, will negatively impact those properties.[3] Moreover,

---

[3] For example, the construction, according to the Borough, "would involve (1) the demolition of the large building [on the property]; (2) the excavation of an extremely large 'launch pit' for a tunnel; [and] (3) the boring of a tunnel from the Property[.]" ECF 1-2, ¶ 150. ALCOSAN will also use the property "for parking for project workers, for equipment storage and as material laydown or storage area for excavation spoils, gravel, pipe and other construction materials." *Id.* at ¶ 151. ALCOSAN has "prepar[ed] design drawings and conduct[ed] site surveys for purposes of laying-out the Project site," which will encompass "construction of a 14-foot wide, 0.8 mile long tunnel under the Ohio River[.]" *Id.* at ¶¶ 127, 152. Because of the construction project's size and scope, among other things, "there will be heavy equipment operating on the Property on a continuous basis, … heavy truck traffic will be present on the site[,] … excessive noise, vibrations and dust and dirt [is unavoidable,] … and excavated material of spoils and materials that are stored on site will necessarily rise[.]" *Id.* at ¶¶ 155-56. "[I]nevitable dust and noxious fumes" will arise and "exacerbate[d] congested traffic conditions" will result. *Id.* at ¶¶ 158-59. These harms will exist, or worsen, because of the property's location—next to a low-income residential complex, near "one of the most heavily traveled commercial corridors in

as noted above, the imminence of the construction is much more certain than any general sort of construction project—the Modified Consent Decree *requires* construction to begin by March 1, 2023. The complaint, in sum, points to a specific and concrete construction project, with well-pled definite harms.[4]

Second, this case turns on ALCOSAN's actions alone, thus minimizing the purported contingent nature of the Borough's claims. While courts often find disputes not ripe when the alleged harm is contingent on a *third party* acting, there is no third-party contingency here.[5] *See, e.g.*, *Texas v. United States*, 523 U.S. 296, 300 (1998) (finding the issue not ripe because it depended, in part, on "[f]irst, a [third-party] school district [falling] below the state standards"); *Artway*, 81 F.3d at 1248 ("[The harm] involves a crucial contingency: only if, after registering, Artway is classified as

---

the Borough," and next to "the Borough's main commercial district and primary retail corridor." *Id.* at ¶¶ 153, 160, 187.

[4] Consider this juxtaposition: "Complaint 1" alleges a possible road improvement construction project on Grant Street in downtown Pittsburgh, and complains of the potential noise, odor, and traffic from such a project. These allegations surrounding general construction, with nothing more, may present an unripe claim, as ALCOSAN suggests. But, on the other hand, consider "Complaint 2" that alleges that the specific location for the construction project is at the 700 block of Grant Street in front of the north entrance to the U.S. Courthouse; it alleges the design of the project is to be the drilling of a 200-foot wide crater; it alleges that the removal of the fill from that crater will be within 100 hundred feet of a heavily trafficked intersection and a 10-story courthouse; and it alleges that the construction is required by law to begin in exactly six months. The specificity of the design, location, harm, and timeframe all bring the claim into focus, presenting a facially ripe claim that is fit for judicial review. So too with the complaint in this case.

[5] While Count III of the Borough's complaint emphasizes third-party business/customers leaving the Borough due to the construction, that is simply one effect resulting from the public nuisance harms that the Borough alleges. That is, as discussed below, Count III (like the others) is based on ALCOSAN's construction causing noise, dust, gridlock, etc. That some third parties may respond to these harms in a certain way does not mean the underlying public nuisance claim is contingent on third parties or otherwise not ripe—the public nuisance itself is still alleged and based on ALCOSAN's actions alone.

a moderate or high risk of re-offense will he face [the harm]. This classification *hinges on a New Jersey prosecutor's future decision* to be reached after applying the Attorney General's 'Registrant Risk Assessment Scale.'" (emphasis added)); *New Hanover Twp. v. U.S. Army Corps of Eng'rs*, 992 F.2d 470, 472-73 (3d Cir. 1993) (finding the dispute not ripe because the purported harm could not materialize, despite the defendant's alleged adverse action, until a third-party state environmental department issued a water quality certificate). ALCOSAN instead points to purported contingencies based on its own future actions. *E.g.*, ECF 5, p. 9 ("[A]ny harm to the public related to the hypothetical work on the Projects is contingent upon the manner in which ALCOSAN conducts a given Project."). While ALCOSAN could, possibly, moot this case (*e.g.*, by choosing a different site for the construction), such purported contingencies do not make the dispute here unripe.

The Court therefore determines that the hardship factor weighs in favor of judicial review.

### ii. The issues are fit for judicial review.

The second factor—the fitness of the issues for judicial review—also supports finding this case ripe. "The principal consideration is whether the record is factually adequate to enable the court to make the necessary legal determinations." *Artway*, 81 F.3d at 1249. Because of the procedural posture of this case, there is no "record" at this time other than the complaint's allegations. But taking those allegations as true, the Court and the parties are aware of the specific construction project the Borough is challenging, the alleged harms, and the legal bases for the claims. At this juncture, where the Court is not conclusively deciding the merits, that is enough. *See Peachlum v. City of York, Pa.*, 333 F.3d 429, 433-34 (3d Cir. 2003) ("The following considerations underpin the ripeness doctrine: are the parties in a sufficiently adversarial posture to be able to present their positions vigorously; are the facts of the case sufficiently developed to provide the court with enough information on which

- 11 -

to decide the matter conclusively; and is a party genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one.").

For these reasons, the Court determines that the Borough's claims are ripe, and accordingly denies ALCOSAN's motion to dismiss on ripeness grounds.

**B.     The Borough sufficiently pled public nuisance claims (Counts I – IV).**

ALCOSAN also moves to dismiss the Borough's public nuisance claims under Rule 12(b)(6) for failure to state a claim.  The Court again disagrees.

### i.     Public nuisance law in Pennsylvania.

A public nuisance exists where a property owner "unreasonably interfere[es] with the rights of his neighbors and the local community." *SPTR, Inc. v. City of Philadelphia.*, 150 A.3d 160, 166-67 (Pa. Commw. Ct. 2016) (citation omitted). Whether a public nuisance exists therefore turns on "the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case." *Reid v. Brodsky*, 156 A.2d 334, 338 (Pa. 1959).  This issue, then, is often a fact-intensive question, as "[w]hether the use is reasonable generally depends upon many and varied facts. … A use that would be reasonable under one set of facts might be unreasonable under another." *Id.*

While public nuisances are often described as "affect[ing] health, safety or morals," *see, e.g.*, *SPTR*, 150 A.3d at 167, it also encompasses interferences with other interests such as "public peace" and "public convenience," *see, e.g.*, *Commonwealth v. MacDonald*, 347 A.2d 290, 301 (Pa. 1975).  Particularly relevant to this case, public nuisances include interferences "with the public safety"; interferences "with the public peace, as by loud and disturbing noises"; interferences "with the public comfort, as in the case of bad odors, smoke, dust and vibration"; and interferences "with public

convenience, as by obstructing a highway … or creating a condition which makes travel unsafe or highly disagreeable[.]" *Id.*

That said, an injunction to enjoin a threatened or anticipated nuisance not yet existing is appropriate only if the plaintiff shows either: (1) the anticipated use of the property will be a nuisance *per se*, or (2) it is "practically certain" that a "nuisance must necessarily result" in fact. *City of Erie v. Gulf Oil Corp.*, 150 A.2d 351, 353 (Pa. 1959) ("An injunction to restrain a threatened nuisance will not be granted unless the facts show that the proposed construction or the use to be made of the property will be a nuisance per se, or if not a nuisance per se, then under the circumstances of the particular case, a nuisance must necessarily result; it must be practically certain, not merely probable." (cleaned up)); *Noto v. Milett*, No. 362 MDA 2016, 2016 WL 6122751, at *3 (Pa. Sup. Ct. Oct. 19, 2016) (citations omitted).

Under the first scenario, a nuisance *per se* exists "when [the business or act] is generally known to be injurious to health and to cause legal damage to property in certain localities and surroundings, regardless of how it may be carried on." *Pa. Co. for Ins. On Lives & Granting Annuities v. Sun Co.*, 138 A. 909, 911 (Pa. 1927). That is, a nuisance *per se* arises when the business or act has "unavoidable, inherent characteristics" that injure the public, no matter how the business or act is conducted. *See id.*; *see also SPTR*, 150 A.3d at 169 ("Typically, a nuisance *per se* is an act which is a nuisance at all times and at all places." (cleaned up)).

Notably, whether a business or act is a nuisance *per se* depends, at least in part, on the specific location where the alleged nuisance exists. *See, e.g.*, *Pa. Co. for Ins.*, 138 A. at 911 (collecting cases describing nuisances *per se* where the harms were "near the home of a farmer," "in a city," "in a residential section," and "near dwellings," and explaining that "[a]ll of these uses were held to possess inherent qualities which, *as to a given locality*, have been condemned by the courts as nuisances *per se*" (emphasis added)). That is, a business or use of property, "though

- 13 -

… lawful," can be a nuisance *per se* "*because of location and surroundings.*" *Id.* (emphasis added); *SPTR*, 150 A.3d at 169 ("[S]ome businesses are, under certain conditions, nuisances *per se* because of location and surroundings," and listing examples).

As to the second scenario, the plaintiff must show that the business or act "is conducted in such way as to become injurious. The injury arises from either an improper conduct of business or one that could be remedied." *Pa. Co. for Ins.*, 138 A. at 911. That is, a nuisance in fact arises when the business or act is not inherently injurious, but rather is conducted as to necessarily become a nuisance. And the "injury must be actually threatened, not merely anticipated; it must be practically certain, not merely probable." *Gulf Oil Corp.*, 150 A.2d at 353.

Thus, a plaintiff seeking to enjoin an anticipated nuisance in fact, rather than an anticipated nuisance *per se*, must make an additional showing. A plaintiff seeking to enjoin a nuisance *per se* need only prove that the act creating the nuisance *per se* will be committed; but a plaintiff seeking to enjoin an anticipated nuisance in fact must show proof of the act as well as the (unlawful) consequences of that act. *See Pa. Co. for Ins.*, 138 A. at 910-11 ("The difference between a business, which … is a nuisance *per se* as to certain location and surrounding, and a business which is being so conducted as to become a nuisance, lies in the proof, not in the remedy. In the former, the right to relief is established by averment and proof of the mere act; in the other, proof of the act and its consequences is necessary.").

With this overview, the Court turns now to the Borough's specific claims.

### ii. The Borough has sufficiently pled claims of inevitable public nuisance.

At the outset, it bears emphasizing that the present issue before the Court is ALCOSAN's motion to dismiss rather than, say, a motion for preliminary injunction brought by the Borough. Thus, this is not a merits-based decision based on an

evidentiary record.  So rather than making the requisite evidentiary showing, the Borough need only have alleged sufficient factual allegations.  It has done so.

At this stage, the Court need not determine whether the allegations constitute a nuisance *per se* or a nuisance in fact.  Rather, it is sufficient that the Borough's allegations, taken as true, state plausible claims for public nuisances under either category.  That is, considering the "particular locality" of the construction site, and the "many and varied facts" comprising the Borough's claims, *see Reid*, 156 A.2d at 338, the Borough has alleged that ALCOSAN will commit acts that will create public nuisances.

Specifically, Counts I – IV are based on ALCOSAN's imminent construction project on the property that will involve the demolition of the building currently on the property, the excavation of a large pit, the boring of a tunnel, and the serving as the launching point for additional construction to occur elsewhere.  *E.g.*, ECF 1-2, ¶¶ 150-51, 168-69, 182-83, 195-96; *see also, e.g.*, *id.* at ¶ 152 (alleging that ALCOSAN has taken steps indicating it intends to proceed with the alleged construction on the property, including purchasing the property, preparing design drawings, and conducting site surveys of the property).  And in all four counts, the Borough alleges that the construction will cause the same, or similar, harms and nuisances—the differences among the four counts are simply who will suffer the harm, and the nuisances' effect on the Borough.  The actual public nuisances, however, remain constant for all four counts.

In Count I, for example, the Borough alleges that the construction project will cause significant noise, dust, noxious fumes, exacerbated traffic congestion, and inconvenient fence placements around the construction site, as well as leave an open excavation pit and accumulating excavated spoils on the site.  *Id.* at ¶¶ 155-63.  The Borough alleges that these nuisances will harm the residential communities surrounding the property.  *Id.* at ¶¶ 153-54.  Specifically, the construction and its

- 15 -

effects, according to the Borough, will interfere with the nearby residents' ability to sleep, to enjoy the outdoor portions of their property, and to use public transportation or walk to nearby stores (because of both traffic gridlock and the dangers/inconveniences of walking around a construction site). *Id.*

Count II alleges similar nuisances resulting from the construction, but focuses on the exacerbated traffic and the surrounding community in general. In particular, Count II emphasizes the property's location in a heavily traveled commercial corridor in the Borough, which already suffers from significant traffic. *Id.* at ¶¶ 171-73. The construction will exacerbate the traffic, causing gridlock and dangerous traffic conditions; this will, in turn, increase the danger to drivers and pedestrians, as well as limit police and emergency vehicles from quickly accessing and responding to the Borough's main commercial and retail areas and nearby residences. *Id.* at ¶¶ 175-76.

Count III alleges the same conditions and harms from the construction, but further alleges that these nuisances will interfere with and disrupt nearby businesses, thereby deterring new business from coming to the area and causing current businesses to leave. *Id.* at ¶¶ 185-91. Finally, Count IV, while framed as based on violations of the Borough's ordinances, is ultimately based on the same nuisances (*e.g.*, open excavations with accumulating excavated spoils, excessive noise and dust, dangerous traffic congestion). *Id.* at ¶¶ 203-15.

Thus, while each count highlights a different "victim" or ultimate detriment to the Borough from the construction, all four counts focus on the same universe of nuisances that the construction will cause. *E.g.*, *id.* at ¶¶ 155-63, 171, 175, 185, 188, 213-16. Reviewing these alleged nuisances, then, the Borough has pled plausible public nuisance claims as to all four counts.

Certainly, the allegations that significant noise, dust, and noxious fumes will result from the construction state plausible claims for an anticipated public nuisance.

*See, e.g.*, *Pa. Co. for Ins.*, 138 A. at 911; *Diehl v. Lockard*, 385 A.2d 550, 551 (Pa. Super. Ct. 1978) (noting that courts have considered "that to permit construction of the premises would result in such noise, fumes, smells, dust and lights that the normal enjoyment of property surrounding the proposed construction and located within that residential area … would be unduly disrupted. Rest and sleep would be effected [sic] and the increase in traffic would be a danger to residents and especially the children of the area"); *Bedminster Tp. v. Vargo Dragway, Inc.*, 253 A.2d 659, 661 (Pa. 1969) ("Although not entitled to absolute quiet in the enjoyment of property, every person has the right to require a degree of quietude which is consistent with the standard of comfort prevailing in the locality wherein he lives." (citations omitted)); *but see Burke v. Hollinger,* 146 A. 115, 117-18 (Pa. 1929) ("The mere fact of annoyance … does not establish the existence of a nuisance, and hence, standing alone, it will not be a sufficient basis for an injunction[.] … One who lives in a city must bear with the inconveniences growing out of his location there, just as he enjoys the benefits flowing from it, even though the construction and use of a building may to some extent affect the personal comfort or preference of neighbors." (citation omitted)).

Dangerous or hazardous conditions to pedestrians walking by the site likewise constitutes a plausible claim.  *See, e.g.*, *Talley v. Borough of Trainer*, 394 A.2d 645, 646 (Pa. Commw. Ct. 1978) (concluding that, even though no actual injury had yet occurred, a nuisance in fact existed because it was a public hazard for the property to contain wrecked and abandoned vehicles, which had jagged edges and broken glass, abutting the public sidewalk).

And increased or exacerbated traffic congestion also states a plausible claim for an anticipated public nuisance. *See, e.g.*, *Nelson v. Duquesne Light Co.*, 12 A.2d 299, 302 (Pa. 1940) ("While trolley poles erected in a public street do not constitute a nuisance per se, … if [they're] placed or constructed as to cause an unnecessary

obstruction to traffic, [they] may constitute a nuisance. … [N]or are the poles of such a line nuisances under such circumstances, provided they do not materially interfere with the rights of the abutting owner or the use of the street for purposes of travel." (cleaned up)); *MacDonald*, 347 A.2d at 301 (stating that interfering "with public convenience, as by obstructing a highway … or creating a condition which makes travel unsafe or highly disagreeable" can be a public nuisance).[6]

For these reasons, the harms and public nuisances the Borough alleges all state plausible anticipated public nuisance claims.  So the Court finds that dismissal is not warranted.

ALCOSAN's arguments to the contrary miss the mark.  First, its general and overbroad assertion that construction projects, or projects related to "infrastructure, public health and public necessities," cannot be a nuisance per se (ECF 5, pp. 14-15) conflicts with Pennsylvania law.  *See Reid*, 156 A.2d at 338 ("[W]hether a … particular use of property constitutes a nuisance, [depends on] the reasonableness or unreasonableness of … making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case… [which] depends upon many and varied facts.").  Second, while ALCOSAN emphasizes that the construction project will create a sewage treatment use/infrastructure (ECF 5, pp. 14-15), that is ultimately irrelevant, as the subject of the Borough's complaint is the

---

[6] Count IV, regarding the alleged violations of the Borough's ordinances, merits the same result because it is based on the same alleged harms and nuisance conditions as Counts I – III.  *See Heinl v. Pecher*, 198 A. 797, 799 (Pa. 1938) ("While the mere violation of a municipal ordinance does not constitute a nuisance unless, of course, the ordinance so provides, if the actual thing is a nuisance or in the nature thereof and it is done or maintained in violation of a municipal ordinance, it may constitute such nuisance as against which relief may be obtained by one who suffers special and peculiar injury of an irreparable nature therefrom[.]" (cleaned up)); *cf. Dressel Assocs., Inc. v. Beaver Valley Builders Supply*, 778 A.2d 800, 802 (Pa. Commw. Ct. 2001) ("A violation of a zoning ordinance is not conclusive of a nuisance or a nuisance per se." (citations omitted)).

construction itself.[7]  Finally, underpinning the crux of ALCOSAN's arguments is the contention that the Borough cannot make the requisite showing on the merits.  *E.g.*, ECF 8, p. 6 ("First, it is not 'practically certain' that a nuisance will occur.").  But as noted above, that standard is not dispositive at this stage.[8]

For all these reasons, the Court denies ALCOSAN's motion to dismiss for failure to state a claim.

## II.  The Borough is an intended beneficiary of the Modified Consent Decree, so the Court denies ALCOSAN's motion to dismiss Count V.

Count V alleges that ALCOSAN violated certain terms of the Modified Consent Decree.[9]  ALCOSAN moves to dismiss Count V, arguing that the Borough lacks standing to enforce the Decree because the Borough is neither a party to the Decree,

---

[7] The Borough is not seeking to prevent the sewage treatment use/infrastructure. Rather, it only seeks to prevent the construction of the sewage treatment infrastructure in a particular location.

[8] Also, citing in its reply brief the Pennsylvania Supreme Court's opinion in *Pennsylvania Company for Insurance*, ALCOSAN emphasizes that to be a nuisance per se, the nuisance must be "an act or *use of property of a continuing nature* offensive to, and legally injurious to, health and property, or both."  ECF 8, p. 7 (italics in original) (citation omitted).  ALCOSAN argues that the construction project has an end date, so the construction does not have a "continuing nature."  *Id.*  But the Pennsylvania Supreme Court limited that language to "private persons."  *See Pa. Co. for Ins.*, 138 A. at 910 ("A nuisance per se, *as relating to private persons*, is an act or use of property of a continuing nature offensive to, and legally injurious to, health and property, or both." (emphasis added)).  Because the Borough's allegations concern a *public* nuisance caused by a *business entity*, that language is inapposite.

[9] While not attached to the complaint, the Court may consider and review the Modified Consent Decree, filed at *United States v. Allegheny Cnty. Sanitary Auth.*, No. 2:07-cv-737, ECF No. 39 (W.D. Pa.).  *See Amelio v. McCabe, Weisberg & Conway*, No. 14-1611, 2015 WL 4545299, at *3 (W.D. Pa. July 28, 2015) (Conti, J.) ("In addition to the complaint, the court may also consider exhibits attached to the complaint and matters of public record in deciding a motion to dismiss. Matters of public record include, among other things, publicly available records and transcripts from judicial proceedings in related or underlying cases which have a direct relation to the matters at issue." (cleaned up)).

nor an intended beneficiary.  The Court, however, concludes that the Borough is an intended beneficiary of the Decree, at least as to the provisions forming the basis of Count V, and therefore denies ALCOSAN's motion to dismiss Count V.

### A. The law on third-party intended beneficiaries of consent decrees.

To determine whether the Borough is an intended beneficiary of the Decree, the Court must turn to federal common law, which ultimately resembles Pennsylvania law.  "Consent decrees are hybrids, with attributes of both contracts and injunctions." *E.O.H.C. v. Sec'y. U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 192 (3d Cir. 2020).  Here, the Modified Consent Decree works like a contract, because the Borough "seeks not to punish but to enforce the other party's commitments under the agreement." *Id.*  And because the United States (through the EPA) is a party to the Decree, federal common law applies.  *See id.* at 192-93 ("[W]hen the United States is a party to a contract, federal common law governs that contract. … [D]isputes about the meaning of consent decrees to which the United States or a federal agency is a party are governed by federal common law." (citations omitted)).

Federal common law, like Pennsylvania, follows the Restatement (Second) of Contracts as to third-party beneficiaries of a contract.[10]  *Doe v. Pa. Bd. of Prob. & Parole*, 513 F.3d 95, 106 (3d Cir. 2008) (citations omitted); *Scarpitti v. Weborg*, 609

---

[10] Some courts have stated that there can never be third-party beneficiaries of a consent decree, though neither party in this case makes this argument.  *See, e.g.*, *Evoqua Water Tech. v. M.W. Watermark*, 940 F.3d 222, 229 (6th Cir. 2019) ("A consent decree 'is not enforceable directly or in collateral proceedings by those who are not parties to it.' … Even intended third-party beneficiaries of a consent decree lack standing to enforce its terms." (citing, *inter alia*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975))); *Becker v. Chi. Title Ins. Co.*, No. 03-2292, 2004 WL 228672, at *9-10 (E.D. Pa. Feb. 4, 2004).  The Third Circuit, however, has rejected this stiff bar, concluding that a consent decree can include third-party beneficiaries.  *See, e.g.*, *Antonelli v. New Jersey*, 419 F.3d 267, 273 (3d Cir. 2005); *United States v. New Jersey*, 373 F. App'x 216, 221-22 (3d Cir. 2010); *Quadrel v. GNC Franchising, LLC*, No. 06-643, 2006 WL 3762072, at *3-4 (W.D. Pa. Dec. 21, 2006) (Lancaster, J.).

A.2d 147, 150 (Pa. 1992) (stating that Pennsylvania follows the Restatement (Second) of Contracts regarding third-party beneficiaries of a contract); *see also Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979) ("The fact that the rights and obligations of the contract may be interpreted by reference to federal law does not mean, however, that [state] law may not be consulted. … Thus, the federal court may, if desirable, look to … [state] law in this case to determine whether Owens is a third party beneficiary under the contract between the United States and Nassau County.").

Section 302 of the Restatement (Second) of Contracts, as relevant here, imposes two requirements for the Borough to be an intended beneficiary of the Decree: "[A] beneficiary of a promise is an intended beneficiary if [1] recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and … [2] the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."[11]  Restatement (Second) of Contracts, § 302.  The first requirement "sets forth a standing requirement" that "leaves discretion with the trial court to determine whether recognition of third party beneficiary status would be appropriate." *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983).  That said, "third-party [beneficiary] status will be conferred only if circumstances compel us to recognize such a status in order to effectuate the intention of the parties." *Doe*, 513 F.3d at 106; *see also Scarpitti*, 609 A.2d at 150-51.  Notably,

---

[11] Section 302 of the Restatement (Second) of Contracts states in full:
> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

however, this "test does not require that the purported beneficiary be adverted to directly in the contract." *Doe*, 513 F.3d at 106.

To make these determinations, the Court must look to the Decree itself—"the 'intentions of the parties' must be discerned from the document itself." *Id.* (citations omitted); *see also United States v. New Jersey*, 373 F. App'x at 221 ("[I]t [is] necessary to look to the consent decree itself to determine what role, if any, was contemplated for nonparties." (citations omitted)).

### B.   The Borough is a third-party intended beneficiary of the Decree.

After reviewing the Modified Consent Decree, the Court finds that the Borough is a third-party intended beneficiary—specifically as to the Decree's provisions requiring ALCOSAN to solicit and consider input from the Borough, and coordinate with the Borough, in finalizing its wet weather plans. *See* ECF 1-2, ¶¶ 219-23.[12]

First, conferring third-party beneficiary status here "is appropriate to effectuate the intentions of the [Decree's] parties." Restatement (Second) of Contracts, § 302. As stated in the Decree, ALCOSAN provides sewage treatment services to the Borough (among others) and had previously agreed to cooperate with the Borough in developing sewer overflow control activities. Decree, *Whereas* Clauses, pp. 1, 3, 4. Yet the EPA alleged that ALCOSAN, in providing these services, was violating the Clean Water Act. Decree, *Whereas* Clauses, pp. 1-2. Thus, the

---

[12] The specific provision of the Decree that the Borough relies on is paragraph 74, which states: "Soliciting Comment on ALCOSAN's Wet Weather Plan. In developing the Wet Weather Plan, no later than six months before the date that such plan is due to the Plaintiffs under this Consent Decree, **ALCOSAN shall solicit comment** on its draft Wet Weather Plan **and shall coordinate with the Customer Municipalities** by providing public participation opportunities on the proposed Wet Weather Plan in accordance with Section VI, Subsection O (Public Participation). **ALCOSAN shall consider such comments from Customer Municipalities** and the public in further developing and finalizing the Wet Weather Plan." Decree, ¶ 74 (bold added). The Borough alleges in Count V that ALCOSAN violated this provision. ECF 1-2, ¶¶ 219-23.

stated purpose of the Decree "is to ensure that ALCOSAN undertakes measures necessary to comply with the Clean Water Act [and related regulations]."  Decree, ¶ 14.  In other words, the Decree's purpose is to ensure that ALCOSAN complies with environmental laws and regulations while providing services to the Borough.

Yet ALCOSAN can only take the requisite measures needed to comply with the Decree if it also complies with state and local laws, regulations, and ordinances.  That is, the Decree "in no way affects or relieves ALCOSAN of any responsibility to comply with any federal, state, or local law or regulation."  Decree, ¶ 150.  Similarly, "ALCOSAN is responsible for achieving and maintaining compliance with all applicable federal and state laws, regulations, and permits, and compliance with this Consent Decree shall be no defense[.]"  *Id.* at ¶ 151.  Further, the Decree "shall not in any way relieve ALCOSAN of: its obligation to comply with other applicable federal, state, or local law or regulation; [and] its obligation to obtain a permit for the Conveyance and Treatment System or any portion thereof or any other facilities[.]"  *Id.* at ¶ 153.

Thus, the parties to the Decree clearly intended for ALCOSAN to comply with Pennsylvania's laws—including public nuisance laws—as well as the Borough's ordinances and permit requirements.  ALCOSAN soliciting and considering input from the Borough would be the necessary and obvious means to ensure ALCOSAN did so.  It follows, then, that allowing the Borough to enforce the Decree's provision requiring ALCOSAN to solicit and consider comments from the Borough, as well as coordinate with the Borough, would effectuate the intention of the parties to the Decree.  Indeed, any measures ALCOSAN took to comply with the Decree's stated purpose would be futile if ALCOSAN did not also comply with Pennsylvania public

nuisance law and the Borough's applicable ordinances and permit regulations.[13] Therefore, recognizing the Borough's right to performance, as a third-party beneficiary, is appropriate to effectuate the intentions of the Decree's parties.

For similar reasons, the Court likewise finds that the circumstances indicate that ALCOSAN and the EPA intended to give the Borough the benefit of the promised performance. *See* Restatement (Second) of Contracts, § 302. As just discussed, ALCOSAN explicitly agreed with the EPA to obtain the necessary permits (from the Borough), and to abide by state and local law, in complying with the Decree. And most significantly, ALCOSAN expressly represented and covenanted to solicit and consider comments from the Borough, and coordinate with the Borough, in finalizing the relevant plans.[14] Decree, ¶ 74. Based on the clear terms of the Decree, the Court determines that ALCOSAN and the EPA intended to give the Borough the benefit of ALCOSAN's promised performance.

As a result, the Court finds that the Borough is a third-party intended beneficiary, and thus has standing to enforce the Decree.[15] The Court therefore denies ALCOSAN's motion to dismiss Count V.

---

[13] Of course, ALCOSAN providing functional and necessary services to the Borough would also be hindered if it did not confer with the Borough as to what services were needed.

[14] ALCOSAN had also been, and will continue to, provide services to the Borough, so any sewage treatment plans that ALCOSAN finalized would affect those services. *See* Decree, *Whereas* Clauses, pp. 1, 3. Additionally, it was established that the Borough (and others) could help alleviate pressure on ALCOSAN. *See* Decree, *Whereas* Clauses, p. 4 ("WHEREAS, the Parties have concluded that efforts by the Customer Municipalities to reduce the volume of Dry Weather Flow and Wet Weather Flow through Green Infrastructure Measures and other Municipal Source Reduction Measures, might reduce the need for some of the storage and conveyance facilities[.]"). This further favors finding that the Decree's parties intended to give the Borough the benefit of the promised performance.

[15] ALCOSAN's arguments to the contrary are unpersuasive. It cites provisions of the Decree concerning the rights of the Decree's parties "as against any third party," and

## **CONCLUSION**

For all of these reasons, the Court denies ALCOSAN's motion to dismiss.  An appropriate order follows.


DATE: May 6, 2022                    BY THE COURT:

                                     /s/ *J. Nicholas Ranjan*
                                     United States District Judge

---

the parties' reservation of their remedies "to enforce the [Decree's] provisions[.]"  ECF 5, p. 17.  It also argues that the Decree contains no "expressed intent" to make the Borough a third-party beneficiary.  *Id.* at pp. 17-18.  Finally, ALCOSAN contends, in conclusory fashion, that the Borough is just one of many incidental beneficiaries.  ECF 8, pp. 9-10.  But these arguments fall short.  First, the provisions ALCOSAN cites are irrelevant here, as this case involves a third party (the Borough) bringing a claim against ALCOSAN; the cited provisions about ALCOSAN's rights "*against* any third party" are not relevant.  The same goes for ALCOSAN's arguments that the Decree's parties reserved their remedies—in no way does this preclude, on its face, a third-party beneficiary.  Second, contrary to ALCOSAN's arguments, the law "does not require the purported beneficiary be adverted to directly in the contract."  *Doe*, 513 F.3d at 106.